ON APPLICATION FOR REHEARING
LEIGH M. CLARK, Retired Circuit Judge.
Appellant’s brief and argument in support of his application for rehearing is accompanied by a Rule 39(k), ARAP, request that consists of approximately three-fourths of the fifteen-page brief, with which request we comply, even though its contents shed little more light on the only issue raised in the brief on application for rehearing than do the facts stated in the opinion rendered by us on original submission. The contents of the Rule 39(k) requests are as follows:
“Mary Grant is the mother of Jessica Grant, who was born on December 21, 1981, and died on February 4, 1982. (R. 4-5). Mrs. Grant testified that C.B. Simmons, the Defendant, whom she had known for about a year, killed Jessica. (R. 5-6). She would see the Defendant at his place of business and often he would come to her house. (R. 6-7). She testified that on February 4, 1982, the Defendant came to her house about 6:00 p.m. on a Wednesday evening, and brought a half-pint of gin and both of them drank some of the gin. (R. 7-8). She testified:
“ ‘Somehow the baby was hollering at the time and I got to go and get the — fix her bottle to give to her. And I sat there to give the baby the bottle. So I laid her back in the bed. Then after that I got up and left and went to the bathroom. And about the time I got back up there the baby was on the floor ... In the front room.
“ ‘Q. Did you hear any noise when you were back in the bathroom?
“ ‘A. Yes, sir. It sounded like a tumbling or something.
“ ‘Q. Okay, And when you got back up there, what happened?
“ ‘A. The baby was on the floor and C.B. wasn’t too far from the baby.
“ ‘Q. What did you say to him, if anything?
“ ‘A. I said, why did you dump my baby on the floor. That’s when me and him went to tussling, fighting.
“ ‘Q. What, if anything, did he do to the baby?
“‘A. Sir?
“ ‘Q. What happened to the baby? You said the baby was on the floor?
“ ‘A. Yes, sir.
“ ‘Q. And you and C.B. went to tussling and fighting?
“‘A. Right.
“ ‘Q. And then what happened?
“ ‘A. Me and him was tussling and fighting and so I asked why he would throw her on the floor. So he went to cussing me. I checked the baby.
“(R. 7, 8, and 9).
“Mrs. Grant further testified that no one else but her, the Defendant, and her three children were present when this occurred. This happened pretty close to midnight and that the Defendant left after this incident whereby Jessica was hurt. (R. 10). She testified that she and the Defendant argued about whether or not to engage in sexual intercourse. (R. 10).
“Upon cross examination, Mrs. Grant testified that she had lost one child to miscarriage and another when the midwife cut the naval string too short. (R. 11). Jessica weighed 5.5 pounds at birth and was in good health at birth. (R. 12).
“Mrs. Grant acknowledged that she testified on 6-24-82 that the Defendant was present in her home for a total of twenty- *472 four hours at this time. She maintained in the face of her testimony at trial that he arrived at 6:00 p.m. and left between the hours of midnight and 1:00 a.m. that he was present for twenty-four hours. (R. 16). She acknowledged that she probably did tell the District Judge in sworn testimony that the Defendant arrived around 4:00 p.m., but stated that if she did so testify, it was not true because he arrived at 6:00 p.m.
“On page R. 21, Mrs. Grant testified that she did not see the Defendant throw Jessica on the floor. On page R. 23, she testified that she was confused when she said that she did not see him throw the baby upon the floor, saying, “After the baby was on the floor, then he picked the baby up and slammed her against the floor.” '
“On pages R. 24 and 25, Mrs. Grant testified that after she and the Defendant f aught and he threatened her and her child, that the Defendant left and did not say anything else. Defense counsel asked, ‘Do you recall telling Judge Sankey and also testifying on June 24, that he said I’m tired of that damn baby hollering?’ Upon further cross, she testified ‘He didn’t say nothing else after me and him had the argument and fighting. He went outside in my yard.’ (R. 25).
“At trial, Mrs. Grant testified that when she picked the baby up from the floor that the baby was dead, but she acknowledged testifying previously the baby was not dead when she picked her up. (R. 29).
“Mrs. Grant testified that she was aware of the numerous bruises and old injuries on the baby but denied that she knew who inflicted them on the baby. Only two people kept Jessica for Mrs. Grant and these were her mother and Mrs. Hill. (R. 36, 37). She denied that she knew that Jessica’s leg had been previously broken. She testified that she fed the baby regularly. The baby cried a ‘right smart.’ (R. 37).
“Mrs. Grant first talked to the police the day that Jessica died, but was in shock. She did not tell the police that the Defendant committed the offense at that time. She talked to the police on the following Friday and still did not tell them about the Defendant. She did not tell the police about the Defendant until 3-5-82, after she had been under arrest and held in jail for 3 days on a charge of child abuse. (R. 39 and 40). She gave a statement to the police, admitted into evidence as Defendant’s Exhibit 4 at R. 45.
“On page R. 44 and 45, she testified that after the incident that Patricia did not go back to bed and she further acknowledged testifying previously that Patricia woke up a little while but finally went back to bed. She said that her prior testimony was a lie. On R. 46, Mrs. Grant testified that her mother found the baby dead at 12:00 noon, and denied giving a statement to the police that her mother found the baby dead at 2:30 p.m.
“Mrs. Grant testified that Abe and the grandmother argued on the Tuesday prior to the baby’s death, but denied that anyone tried at that time to harm the baby. She acknowledged that her mother would stick all three babies with pins. The Defendant never touched the baby until this incident, and he never mistreated any of the children. (R. 51, 52, 53, 55, and 56).
“On pages R. 65 and 66, Mrs. Grant testified that she had a little baby jar full of gin on that night and denied testifying previously that she had two drinks. In her statement to the police, she stated that she had two drinks. Defendant’s Exhibit 4. She acknowledged that she did not tell the truth about the amount that she drank in her previous testimony. On pages R. 66 and 67, Mrs. Grant testified that C.B. had been there some 2.5 hours when she went to the bathroom.
“Dr. Thomas Gilchrist of the Department of Forensic Sciences testified as to the cause of death. , He testified that the child, small and quite emanciated [sic], died of blunt trauma to the head. (R. 74). The child was suffering from severe malnutrition which was a significant factor in the death. She weighed 4.5 pounds at death. (R. 75). The child had numerous injuries inflicted upon it in its short life. Several *473 weeks prior to her death, Jessica’s left leg was broken, and had begun to heal. It was re-injured at the time of her death. (R. 75 and 91). She had numerous fresh and healing abrasions, some of which were from two to five days old. (R. 74, 75 and 89). Her ribs were freshly broken. (R. 75).
“Billy Wayne Smith is an investigator with the Montgomery Police Department and he investigated the scene after receiving a report that a baby was dead. He subsequently conducted a photo lineup in which the Defendant was identified as the killer by Patricia Grant, the oldest daughter of Mary Grant. (R. 95, 96, 97 and 98). He took the statement from Mary Grant on March 5, 1982, and thereafter obtained a warrant for the arrest of C.B. Simmons. (R. 104). Upon the Defendant’s arrest, he stated that he was unaware of what happened to Jessica and denied being in the Grant home on the night in question. (R. 106). Smith testified that he had reports of a disturbance in the Grant home on the Tuesday preceding the death of Jessica, and that these reports involved the grandmother, Abe, Wilk, and Jessica. (R. 112).
“Josephine Hill lives next door to Mary Grant and has lived there for 23 years. (R. 114). On Wednesday night in question, Mrs. Hill saw the Defendant upon the porch of Mary Grant around 11:30 or 12:00 p.m. (R. 115). The houses are close to one another and she could hear any disturbance at Mary’s house if she were not asleep. On this evening she was watching t.v. when she saw the Defendant and did not hear a disturbance. (R. 118, 119).
“Patricia Grant was called as witness for the Defendant. She testified that she saw the Defendant put a knife around the neck of Jessica, and saw him twist her arm and leg before he threw her hard upon the bed. (R. 131, 133). She pointed out the Defendant as the assailant. (R. 139). She denied that anyone named Wilk hurt Jessica, and upon cross examination stated that Wilk was a made up name. (R. 138). She testified that she went back to bed after the incident. (R. 140). She gave a statement to the police on 2-11-82 which was introduced as Defendant’s Exhibit 5. She states in pertinent part:
“ ‘Q. Do you know anything about why Jessica got sick and went to live with Jesus?
“ ‘No.
“ ‘Q. When did Jessica get sick?
“ ‘A. Not this past Tuesday, but the Tuesday before that.
“ ‘Q. How was Jessica sick?
“ ‘A. She started crying, then she started throwing up.
“ ‘Q. What time of day did you see Jessica getting sick?
“ ‘A. Around 7:00 in the morning, that Tuesday.
“ ‘Q. Who all was at your house that Tuesday?
“ ‘A. Me, my mama, a man named Wilks, Cassandra and Jessica.
“ ‘Q. Did you stay home all day that day?
“ ‘A. No, I got up and got dressed, and ate some fried chicken, studied my lessons, then turned on the t.v. and watched fcv. Wilk started messing with Jessica. He was fumbling around the bed, and had his knife out, with the blade open, and was trying to cut her neck. He and my mama started fighting and he tried to cut her, and she tried to get the knife from him, and the knife fell on the floor, and he ran out the back door and jumped over the fence.
“ ‘Q. Where did Wilk get the knife you saw him try to cut Jessica and your mother with?
“ ‘A. I saw him get it from the t.v. it was a pocket knife with two blades, and he had it on the t.v. all night.
“ ‘Q. Did Wilk spend the night at your house that Monday night?
“ ‘A. Yes, he slept on the floor in the front room that night, and I did too, I unusually [sic] sleep in the back room, but I slept in the front room that night, cause I didn’t want Wilk to hurt my sister. Jessica slept in the front room that night on the bed on the left, I slept on the Couch, and he slept on the floor *474 between us, I was told by grandmother, that Wilk, had cut another little girl, named Lisa, and that he had killed her. The little girl’s mother is Betty Jean Robinson, who is my aunt.
‘“Q. Is Wilk you mother’s boyfriend?
“ ‘A. No, he is my grandmother’s boyfriend.
“ ‘Q. Have you ever seen anyone else besides Wilk to hurt Jessican? [sic]
“ ‘A. Yes, my grandmother, I saw her stick baby diaper pins in her leg and make it bleed, and she was saying bad words to Jessica, and I ran to the kitchen and told mama and she came in there and told my grandmother to stop and then they started fighting and my grandmother hit my mama.
“ ‘Q. When did you see your grandmother stick the pins in Jessica?
“ ‘A. That same Tuesday, it was about 8:00 at night, me, Cassandra, Jessica, my mama, my grandmother and Wilk he was laying on the floor drunk.
[[Image here]]
“ ‘Q. Have you ever heard anyone say they would want to hurt Jessica?
“ ‘A. Yes, my grandmother, she hollers all the time, the only one she loved was Cassandra.
‘“Q. That Tuesday when Jessica got sick did you go to school?
“ ‘A. Yes sir, I went up to Mrs. Green’s house to catch a ride, and on the way I saw my grandmother, she was going over to my house. When I got home, my mama, my grandmother, Cassandra, Jessica and Wilk was there. Jessica was asleep and then she woke up after about an hour, hollering.
“ ‘Q. Who spent the night at your house that Tuesday night?
“ ‘A. Me, my mama, Wilk, my grandmother, Cassandra, and Jessica. I slept in the front room again, with Jessica, my grandmother slept in the back room, Wilk slept on the floor again in the front room, and my mama slept in the chair in the front room.
“ ‘Q. When you got up on that Wednesday morning, was Jessica crying?
“ ‘A. No, she was just laying there with her eyes open, playing.
“ ‘Q. When you got home Wednesday from school, did you see Jessica playing in her bed?
“‘A. Yes.
“ ‘Q. Who spent the night at your house that Wednesday night?
“ ‘A. Me, my mama, Cassandra, Jessica, my grandmother, and her other boyfriend, Abe Lewis.
“ ‘Q. Where did each of you sleep that night?
“ ‘A. I slept in the back room with my grandmother, and Abe, in the same bed, my mama slept in the chair in the front room, Jessica slept on the bed in the front room, and Cassandra slept on the couch in the front room.
“ ‘Q. When you woke up Thursday morning, was Jessica crying before you went to school?
“ ‘A. She was laying in the bed hollering.
“ ‘Q. Who all was at your house when you left to go to school last Thursday morning?
“ ‘A. My mama, my grandmother, Cassandra, Jessica, Wilk, and Abe, he came back for my grandmother to wash his clothes.
“ ‘Q. Did anything happen that morning?
“ ‘A. Yes, Abe and Wilk started fighting over my grandmother, in the front room where Jessica was, and she was hollering, and they were drinking whiskey.
“ ‘Q. What happened that Thursday afternoon when you got home from school?
“ ‘A. Wilk and my grandmother started fighting because she didn’t want to go with him any more. They were fighting in the front room, where my mama, Cassandra, and Jessica were at, and I was in my room in the back and saw Wilk holding Jessica by the head, and then he threw her on the floor, then my mama picked her up and layed her in the bed. She told him she was going to kick his *475 ass, then he started to fight my mama, and she said I’m going to call the police, and Wilk then ran out the back door. I also saw Wilk twist Jessica’s leg. My mama told my grandmother, that Wilk shouldn’t have done that to the baby, and my grandmother said he should have killed her.’
“After her mother was placed in jail, Patricia viewed a photo lineup and identified the defendant as the assailant. She gave a statement to the police, Defendant’s Exhibit 7, in which she stated in pertinent part:
“ ‘Q. What all can you tell me about this man you picked out of the folder, concerning him coming to your house, and what all he done and said, that night that little Jessica was hurt?
“ ‘A. C.C. [sic] came to my house on a Wednesday in February in the afternoon to see my grandmother. They sat around and talked and drank some wine. I think they called it Thunderbird. My mama and C.C. [sic] got into an argument but I don’t know what it was about. My grandmother and C.C. [sic] was fighting too, but I don’t know why. After they had stop [sic] fighting my grandmother left and went home, to pick up my cousin. I think it was around 6:00 p.m. when she left. C.C. [sic] stayed there at my house, around the front room, where my mama was asleep in the chair. I went to bed in the back bedroom that night and I woke up and heard my mama and C.C. [sic] fussing in the front room. I got up and saw them fighting and I saw C.C. [sic] hitting my mama, so I went to the kitchen and got the broom and hit him on the shoulder and he didn’t do anything, he just kept on fighting my mama. I got the broom after him but I can’t remember if it was before he hurt Jessica or after. I got out of bed and he was trying to cut Jessica around the neck and that is when my mama started hitting him. He started hitting her and they were both cussing. I saw C.C. [sic] pick Jessica up by the head, and he twisted her leg, and throwed her back on the bed. That is when he got the knife and put it around her neck. Then my mama started fighting him, and told me to go get the broom and I did and went up there and started hitting C.C. [sic]. Then my mama said I’m going to call the police and he said I’ll kill you if you call the police and then he told me I’ll kill you if you tell anybody what I did to your mama. Then he told my mama he was going to kick her ass. The he left.’
“Charles B. Simmons testified in his own behalf, and in essence stated that he did not kill the baby and knew nothing about it. He admitted that he was there for something over an hour on that evening, having arrived about 11:45 p.m. He stated that he and Mrs. Grant had sex, and that she drank some gin that he carried to her. He denied drinking any of the gin himself. He stated that he went back to her house the next night and she stated that her baby had passed.”
Having completed compliance with appellant’s Rule 39(k) request, we now discuss the argument of the attorney for appellant in support of his contention that the judgment of the trial court should be reversed, which is divided into two separate parts that we now separately consider. In the first part, the position is taken that the trial judge applied the scintilla rule in determining that the case should be submitted to the jury. Appellant’s attorney bases his contention upon what was stated by the trial judge promptly after the State had rested and the following occurred out of the presence of the jury:
“MR. DAVIS [Defendant’s trial attorney]: Your Honor, at this time the Defendant would move to exclude the evidence and for a motion for directed verdict of acquittal. On the grounds, we feel the State has not established a prima facie case. I don’t know if they established venue as well. On these grounds we feel they have not made a prima facie case. We will move to exclude the evidence and also for a directed verdict of acquittal.
“THE COURT: All right. The Court is constrained to find there is a scintilla on *476 each element of the defense charge and consequently obliged to deny the defense motion for a directed verdict of acquittal and to exclude the evidence.
“MR. DAVIS: All right, sir.
“THE COURT: Okay. Let’s take a break, folks.
“Whereupon, at 3:45 p.m. the Court recessed and at 4:05 p.m. all parties being present the trial proceeds....”
We agree with counsel for appellant that by the use of the word “scintilla” the trial judge was employing language that is applicable in civil cases as to a plea of the general issue but is not applicable in criminal cases as to the plea of not guilty. It is unfortunate that the word was employed, as it has no place in the trial of a criminal case. It is fortunate that it was not used by the trial judge in the presence of the jury. On the other hand, the trial judge in its own charge to the jury instructed the jury fully and correctly as to the burden of proof, that as to defendant’s plea of not guilty the burden was upon the State to prove by the evidence beyond a reasonable doubt that defendant was guilty, while as to the defendant’s plea of not guilty “by reason of mental disease or defect,” the trial judge stated to the jury, inter alia, “by his plea raising the issue of whether he was mentally responsible for his alleged acts, the Defendant assumes the burden of proving to your reasonable satisfaction that at the time of the commission of the alleged act, committing all or an essential element of the offense with which he is charged, that he, the Defendant, was suffering from mental disease or defect and that as a result of such mental disease or defect the Defendant was either unable to appreciate that committing the alleged acts would constitute a criminal conduct or was unable to conform his conduct to the requirement of law, or both.”
Our consideration of the brief of counsel for appellant in support of the application for rehearing convinces us that there is much to be said in favor of the contention of appellant that the weight of the evidence was in favor of defendant, but we are not convinced that the trial court committed reversible error in overruling defendant’s motion for a new trial. As stated in White v. State, 294 Ala. 265, 314 So.2d 857, at page 864 (1975), cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288:
“A trial judge has the power to grant a motion for a new trial if the verdict is contrary to the great preponderance of the evidence, or if there is newly-discovered evidence. Davis v. State, 245 Ala. 589, 18 So.2d 282 (1944). Granting the motion is largely within the discretion of the trial court, whose discretion should not be exercised to grant the relief sought except in plain cases of deviation from justice and right.”
Of the large number of reported cases on the particular subject, appellant’s attorney cites only the case of Sutherland v. State, 24 Ala.App. 573, 575, 139 So. 110, 110 (1932) from which the following is quoted:
“The conviction of this defendant rests upon the testimony of Burt Dunn and Tom Burchfield, one of whom is an ex-convict, and both are shown without dispute to be men of bad character and unworthy of belief on oath. Both of these men had an equal opportunity to have killed deceased and in fact, according to their own statements, were at the camp and within thirty-eight feet of the dead body for an hour before defendant returned to camp, and their testimony as to what occurred when defendant did return is identical as to detail. The defendant proved a good character and denied any connection with the crime, saying that when he returned to camp the deceased was lying near the camp dead. No motive is shown for the crime and but for the testimony of Dunn and Burch-field rests in inferences to be drawn from the facts, many of which could be made to apply with equal force to some other than the defendant as the guilty agent. While the facts are in dispute, we think that from all the facts and circumstances evoked on the trial the defendant should have a new trial.”
The facts in the instant case are distinguishable in many respects from the mate *477 rial facts stated in Sutherland v. State, particularly in that the defendant herein did not prove “a good character” as did Sutherland. In our opinion, neither Sutherland nor any other reported case on the subject is to the effect that the trial court in the instant case should have granted defendant’s motion for a new trial.
OPINION EXTENDED; APPLICATION FOR REHEARING OVERRULED.
All the Judges concur, except TAYLOR, J., who recuses himself.